May it please the court. My name is Christopher Hayes. I represent the appellant Robert Mitchell Hoxworth. My opening argument is seven minutes with three minutes in rebuttal. The instant appeal arises after a trial by jury where the jury entered a guilty verdict for the offense of felon in possession of a firearm. The appellant filed the appeal raising two issues. First, the appellant argues the district court erred in granting the government's motion in limine, prohibiting the defendant from arguing justification defense of self-defense in relation to his charge of being a felon in possession of a firearm. The second issue raised on appeal is that the district court erred in concluding that the Mr. Hoxworth's prior Texas conviction for aggravated assault is a predicate offense to classify him as an armed career criminal offender. In regards to the first issue on appeal, Mr. Hoxworth argues that he satisfied the four elements for the submission of a self-defense instruction is set forth in the United States versus Bonilla Solano. The evidence presented in regards to supporting his position that he was justified in possessing a firearm was based only on Mr.  He was under an unlawful and present and imminent impending threat that would lead a reasonable person to believe that it would be necessary to possess a firearm, even though he knew he was a convicted felon and prohibited from possessing that. Were there any facts other than his statements to justify his account of being pursued and threatened by armed individuals? Your Honor, Mr. Hoxworth's testimony was primarily the basis. However, he told the same story three times to three and three individuals that same morning. Was there any corroborative evidence of things in the woods, anything other than his own statements? The fact that he left his truck in the middle of the woods, that he was injured with blood covering his body, those were all corroborated by the investigating officer. Have we recognized the justification defense in any of our cases yet? No, Your Honor. In fact, the case law that I relied on, in particular, Dinkins, said that the Eighth Circuit has not yet recognized a self-defense instruction for being a felon in possession of a firearm. And in both Dinkins and Williams, there didn't appear to be any sort of present or imminent threat. Those convicted felons were possessing firearms for some sort of perceived threat, either based on their employment or location in a high-crime area. In this particular case, Mr. Hoxworth testified that he was under an imminent threat, and there was no contradictory evidence presented before the jury. What was the imminent threat, though? I mean, I understand that he thought he arrived at the house of the person who had set him up earlier in the day. But when we talk about imminence, we talk about somebody ready to attack or actually attacking or somebody showing extreme anger. I don't understand anyone to have actually even been outside or to have spotted him when he decided to make his so-called stand. Your Honor, Mr. Hoxworth testified that as he was leaving his shed, dropping off of bed, he noticed some tools that had been stolen from him and noticed at least three individuals with firearms approaching him. At that point, he got in his car to drive away and noticed those same three or four individuals hop in their car and continue to follow him down the highway. But that was earlier that day, right? That wasn't when he came upon the – where he ended up having the – where he made his stand, so to speak. Yes, sir. When Mr. Hoxworth – it took about four or five hours of him running through the woods. He came across a home where he believed that the person that set him up, he thought he ran across his home. When he saw a man approaching him from the house, he believed that that man posed an imminent threat as that man had a 9-millimeter in his hand. Once he determined that that person was not the threat and simply a homeowner, Mr. Walden, Mr. Hoxworth put the rifle down at his feet. He was under the influence of substances? Your Honor, I believe the investigating detective testified that it appeared as though Mr. Hoxworth was under some form of – Were there any tests conducted? No tests presented at trial, Your Honor. Only officers' observations. And that officer did not conduct any sort of field sobriety test to determine what type of controlled substance or alcohol Mr. Hoxworth would have been under at that time. In regards to not recklessly or negligently placing himself in the situation – One more question on that. So you had mentioned that the testimony or his story had suggested that the homeowner had come out. Was there any evidence that the homeowner had spotted him or otherwise was approaching him in particular? So sometimes the homeowner just comes out to put something in the trash can or something like that. Was there any part of that testimony that suggested that he was approaching him? Yes, Your Honor. The homeowner, Mr. Walden, testified that he did spot Mr. Hoxworth. Okay. Grabbed his 9mm from the kitchen and walked out of the home to directly confront Mr. Hoxworth. I see. Okay. There was no evidence presented that Mr. Hoxworth had recklessly or negligently placed himself in that position. He was simply there dropping off of bed. In regards to no reasonable legal alternative to violating the law, Mr. testified that his telephone was not working properly. He was traveling at a high speed down the highway. He was in an unfamiliar area, so he couldn't drive to a sheriff's department or police department. As soon as he realized that the threat abated, he put down his firearm. Now, one last question. I was just reviewing my notes. Does the record indicate when Mr. Hoxworth had the rifle? In other words, my understanding of the record is that he had the rifle before the homeowner came out of the home and approached. Am I wrong about that? No, Your Honor. When Mr. Hoxworth saw the mailbox where he believed that he had stumbled upon his assailant's home, at that point, he said he was exhausted, couldn't run through the woods anymore, injured. So, at that point, he obtained the firearm from a truck parked in the driveway. Does that make a difference in the sense that one could conceive he had a self-defense issue once the homeowner came out, but that he possessed the gun even before there was an imminent threat? The fact that he ran upon his perceived assailant's home is a threat in and of itself. As he reached the home, he saw a car pulling into the driveway and believed that that was the assailant coming towards him. Your Honor, in regards to Mr. Hoxworth's second point on appeal, we are asking the court to follow the prior precedents set forth, in particular, United States v. Schneider, as the North Dakota statute that the court held did not qualify as a predicate offense is nearly identical to the aggravated assault statute that Mr. Hoxworth pled guilty to back in 2006. I understand that there is a conflict not only among the many circuits of the United States, but also a conflict among the Eighth Circuit. Based on the Schneider decision following in fields, we are requesting that the court along that carve-out as the Texas aggravated assault statute could also be committed through reckless conduct. Referencing state law as cited in my brief, in regards to how Texas treats the statute, the Duran decision also notes that the offense can be committed through reckless driving or DWI offense, causing serious physical injury. So your position is reckless driving causing injury does not involve the use of force? Yes, Your Honor. That is based on my reading of the Schneider decision. I just want to emphasize that we are requesting the court to follow the Schneider decision because that North Dakota statute is nearly identical to the Texas statute. Thank you, Mr. Hayes. Mr. Coffey? May it please the Court, Mr. Hayes? While we have that fresh in our minds, thinking about the second issue, would you address that first? Oh, yes, absolutely. The specific question, of course, is whether the Texas aggravated assault statute constitutes a violent felony under the ACCA, but the actual question, the overarching question here, page 31 of our brief, whether an assault committed recklessly that would otherwise constitute a violent felony under the force clause nevertheless fails to qualify if it is capable of being committed by reckless driving resulting in injury. That decision, that holding, first came in a case from this Court called Osana. It involved both an interpretation of the residual clause and an interpretation of the force clause. And somewhere along the way, during that opinion, the Court got confused and incorporated the gay language involving the residual clause into the force clause analysis where it didn't belong. It was followed successfully in boos and downs, and then we had the Supreme Court deciding the Voisin case, not under the ACCA, but under the misdemeanor assault in the unlawful use of a weapon statute. And basically, they say, the Court said, a person uses force if he does so recklessly as well as intentionally. So, we come to the Fields case, and we thought, okay, also, left out fog. So, then we have a case from the Eighth Circuit, fog, where you have a reckless assault, and the Court applied Voisin to the ACCA. Now, it did not involve a case involving reckless driving. Fields was the first case which basically teed up the issue, but it was decided under guidelines. And in that case, the Court again followed Osana and again made reference to Begay. And Begay, once again, a residual clause case, which basically said under the residual clause that you need violent or assaultive conduct or some language like that. It isn't in the text of the force clause. It is a standard that they were using to determine whether offenses which weren't listed in the residual clause, whether they were similar to those that were listed. All right. You don't need that sort of analysis when you're looking at a force clause case. Judge Colleton, in his concurring opinion, descending from the denial of rehearing, and I think it was Schneider, pretty much summarizes our argument. I don't really believe generally in block quotes. I don't find them helpful normally. I don't think the Court wants to read them. But on page 46 and 47 of our brief, it pretty much lays out what our argument is. That argument also appeared in our motion for rehearing in Fields. Now, Fields was a case involving guidelines. We attempted to obtain review in bank. But since it involves a guidelines issue, the Solicitor General's position, which they should resolve those disputes. And we are sort of stuck with them. So we did file a motion for rehearing in Fields. But unfortunately, it was merely a panel rehearing. And we were unable to convince Judge Loken to send it in that case. But we were unable to convince Judges Molloy and Murphy, who were the other two judges, to rehear the case. And then in Schneider, I think the government didn't file a motion for rehearing or rehearing on bank, as I recall. You are correct. And I suspect that that might have had something to do with the fact that we didn't get rehearing in the case. I can understand the judges thinking, well, if the government doesn't care, why should we? But it's not that we didn't care. It's that the Solicitor General has this policy, which as far as I know, they've rarely or ever wavered from, where they're just not going to seek review in cases involving guidelines. We're sort of fortunate that Judge Wimes may have gotten it wrong here because otherwise these cases would go on for years with district judges unable to sentence according to the ACCA because the courts are going to say the violent felony definition is the same as the guideline definition and it will never come back to the Court of Appeals. That is absolutely true, Your Honor. We are somewhat fortunate that we have this vehicle. We've had a vehicle in two prior cases, arguably. There have been two ACCA cases. But in one of those cases, we had two other felonies, which arguably didn't count. And in the other case, we had a situation where Judge Erickson would have been disqualified and we would not have had a vote of the entire active judges. So this is the case that we have teed up. Our argument, of course, is that the court should have followed by Cuisine and Fogg and that the court got it correct. We understand that this court may feel bound by the prior panel decisions. Do you concede, though, under the current precedent? I know you're setting this up potentially for en banc re-hearing, although who knows what the Solicitor General is going to do. Do you concede, though, under current law that you lose here on this particular statute? Yes. If you disagree with our position that the controlling cases are Visine, Fogg, and Rainey, our argument is that those were prior in time they should control. But that argument has been rejected already. So we don't expect to win. And the reckless driving cases in particular, I think, go against your position for the most part. Yes. I mean, but our argument is, I mean, if I swing a bag of hammers and hit you recklessly, that would count. But if I drive a 3,500-pound, 4,000-pound automobile at you, maybe to scare you or to intimidate you, and I hit you, that doesn't count? That doesn't make any sense. And as I said, we're here only because the residual clause jurisprudence has slopped over into the force clause. The Ninth Circuit made kind of short shrift of the argument. The Ninth Circuit said there's no basis for this carve-out. And no other court, to my knowledge, has carved this out, nor I don't think they would have a reason to do that. So in any event, that's pretty much our position here. I did want to talk about the first issue briefly, although obviously the second issue is by far the most important issue. I think the question here is judged by your questions regarding when did he see the homeowner. All right. Let's assume everything he says is true up to that point. He's at the house. He's been running through the woods for four to five hours. He thinks someone four and a half hours earlier has been chasing him. He sees the mailbox, which apparently said Walden on it, but he just sees letters. He just sees an eye chart, alphabet soup. And so he thinks that this person who might have set him up is in the house. Now, according to the evidence, the homeowner is not outside the house at this point. He's knocked on the door. He's looked inside. He didn't see anybody. So he goes and gets the rifle. He has the rifle from the car. He is attempting to load the rifle before he ever encounters the homeowner. The homeowner's testimony, which is undisputed, is that he sees the guy outside with the rifle. He then has to get, he didn't have it on his person, he had to go get his Glock, walk outside and confront the individual. So even if everything the defendant said is true, now our first point is, he more or less conceded it wasn't. The first element is that he is under an imminent impending threat of such a nature as to induce a well-grounded apprehension. And he basically agreed at the end of the day that, all right, I got this wrong. This isn't the guy that set me up. Okay? He basically conceded it wasn't a well-grounded. But the point was, he had other alternatives. Even if up to that point he's thinking somebody is after him, he can just walk away. No one is chasing him at this moment. Counselor, am I incorrect that in the record there's test results or some testing was done and there were substances found in the defendant's blood? I don't remember. I do remember, and I think I would have put that in my brief, but I will stand on whatever the record says. I do know that there was an officer who said that he appeared to be under the influence of something. Well, I just got a note that there was a PSR-15. I don't know if you've got that. I don't have it in front of me. You've got the PSR, but it mentions that he had admitted to consuming alcohol and had tested positive for opiates, amphetamines, and methamphetamines. Well, that certainly would explain the story that he told. But, again, as I said, the officer on the scene said it did appear, and I have no reason to doubt that. I may have overlooked it. But, yes, that would certainly explain the story. And, again, this did look like he was under some sort of hallucinogens because nothing made a lot of sense. It may well have been that he was running through the woods, that seems to be true, and had banned his car there, but the evidence was that there was no indication that anybody had been chasing him or anything of that nature. But, again, and I can't emphasize this too much and I see my time is up, but even if you get him into the house, he obviously had alternatives. He could have simply walked away. He didn't have to run back through the woods for five hours. He just could have gone back into the woods, could have flagged down a car, could have turned around. He wasn't under any apprehension. And, instead, he decided to make a stand, which actually wasn't making a stand. It was taking the fight to this guy who was not the person that he thought he was. Thank you very much, Your Honor. Thank you, Mr. Coffey. Mr. Hayes, I'll give you about 30 seconds or so to wrap up. Yes, Your Honor. If we've used your time. If I could just address the controlled substance in his system. There were no results of any tests that were administered that were introduced at trial before the jury. In regards to an imminent threat. Was it in the PSR? Yes, it was in the PSR. Was it objected to? No, that was not objected to. And I'm just relying on the evidence that was presented on the record before the jury in consideration on whether the self-defense jury instruction should have been submitted. Thank you, Mr. Hayes. Thank you also, Mr. Coffey. We appreciate your argument to the court and the briefing that's been submitted and we'll take it under advisement. Thank you, Your Honor. If you'll excuse me.